## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United HealthCare Services, Inc. and UnitedHealth Group Incorporated, | Case No. 20-cv-02696 |
| Plaintiffs, | |
| vs. | **COMPLAINT** |
| Carlos Louro, | |
| Defendant. | |

Plaintiffs United HealthCare Services, Inc. ("UnitedHealthcare" or the "Company") and UnitedHealth Group Incorporated ("UHG" and, together with UnitedHealthcare, the "Plaintiffs"), by and through their undersigned counsel, hereby bring this Complaint against Defendant Carlos Louro ("Louro") and allege as follows:

### INTRODUCTION

1.      Plaintiffs brings this action to protect their greatest assets—namely their competitive edge in the form of their underwriting and pricing strategies, formulas, and factors applicable to its health benefits business. Louro, who was a trusted and core member of UnitedHealthcare's underwriting team, regularly engaged with and used that underwriting and pricing information for pricing and underwriting self-funded and fully-insured accounts, including large, national accounts and some small, regional accounts. Indeed, during his tenure at UnitedHealthcare, Louro was daily exposed to, worked with, and developed key aspects of UnitedHealthcare's confidential and proprietary underwriting and pricing information, which crossed business lines and segments.

2.     UnitedHealthcare valued Louro and his contributions and routinely rewarded him with lucrative bonuses and benefits, including awards of UHG stock options and restricted stock units ("RSUs").

3.     On December 3, 2020, Louro unexpectedly announced that he was resigning to accept an underwriting position at Anthem, Inc. ("Anthem"), scheduled to begin on December 28, 2020. Anthem ultimately agreed to delay Louro's start date to December 31, 2020.

4.     Louro's knowledge of UnitedHealthcare's confidential and proprietary information—the heart of UnitedHealthcare's competitive edge—would directly benefit Anthem, one of UnitedHealthcare's fiercest competitors, despite Louro having received that knowledge through and reaped the benefits of his UnitedHealthcare employment and UHG benefits. And regardless of Louro's start date at Anthem, Louro's employment there will (1) breach both his stock option and RSU award agreements (the "Agreements"), including his breach of the reasonable restrictive covenants contained in the Agreements, which Louro acknowledged each and every time UHG provided him with equity, and (2) will result in the misappropriation of UnitedHealthcare's trade secrets, as Louro will inevitably use or disclose trade secrets while performing his new job—a job that directly overlaps with the role he previously held at UnitedHealthcare. The resulting harm to Plaintiffs will be significant and irreparable.

5.     In this action for breach of contract, violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 (the "DTSA"), violation of the Minnesota Trade Secrets Act, Minn. Stat. § 325C.01 *et seq.* (the "MTSA"), and violation of the Delaware Uniform Trade

Secrets Act, 6 De. Code § 2000 *et seq.* (the "DUTSA"), Plaintiffs seek injunctive relief (1) preventing Louro from beginning his planned role at Anthem and for a period of 12 months from entry of the order, consistent with the terms of the Agreements, and (2) preventing Louro from disclosing UnitedHealthcare's trade secrets and other confidential information at any time. Plaintiffs also seek damages for Louro's breaches and trade secret misappropriation, including the forfeiture and/or repayment of certain benefits conferred by UHG on Louro pursuant to the terms of the Agreements awarding those benefits.

## THE PARTIES, JURISDICTION, AND VENUE

6.      Plaintiff UnitedHealthcare is a Minnesota corporation with its principal places of business in Minnesota. UnitedHealthcare is an Affiliate and wholly owned subsidiary of Plaintiff UHG, a Delaware corporation with its principal place of business in Minnesota.

7.      Defendant Carlos Louro is an individual who was employed by UnitedHeathcare and, by virtue of that employment, entered into the Agreements with UHG related to his equity awards that contained restrictive covenants for the explicit and agreed benefit of UnitedHealthcare. At the time of his resignation from UnitedHealthcare, Louro was a resident of and was domiciled in Connecticut and, upon information and belief, Louro continues to be a resident of and is domiciled in Connecticut.

8.      In addition to the irreparable harm that Plaintiffs will experience, Louro's breach will result in damages, including the forfeiture of $131,583.87 in equity benefits that he received under the Agreements.

## FACTUAL BACKGROUND

### The Market in Which UnitedHealthcare and Anthem Compete

9.      UHG is a diversified health care company that offers both health care coverage and benefits, as well as information and technology-enabled health services, through a family of closely related affiliate companies. UnitedHealthcare, one of those affiliate companies, is UHG's health care benefits business. UnitedHealthcare offers health care benefits for all ages and lifestyles, including individuals, employers, and Medicare and Medicaid beneficiaries.

10.     Anthem is a direct competitor of UnitedHealthcare in the health care coverage and benefit space.

11.     The health care coverage and benefits space is highly competitive.  Not only do UnitedHealthcare and Anthem compete on a national scale, but they also directly compete in the majority of states and United States territories across multiple lines of business.

12.     Because of the competitive nature of the industry in which UnitedHealthcare and Anthem operate, UnitedHealthcare takes great care to develop comprehensive, strategic plans for pricing and underwriting its products. UnitedHealthcare's strategic plans—including its pricing and underwriting formulas, algorithms, and strategies—have tremendous value and help UnitedHealthcare maintain its market share while fending off encroachment from direct competitors like Anthem.

### Underwriting in the Health Benefits Market

13.     At UnitedHealthcare, roles in the Underwriting & Pricing job family relate to determining premium rates, service and risk fees for UnitedHealthcare's customers, which in turn provide insurance coverage to millions of individuals. Underwriting and Pricing job functions use underwriting principles, financial and statistical modeling, trend projection, and proprietary competitive intelligence factors to lead and support the development of UnitedHealthcare's pricing and rate setting process. The process involves analyzing risk and setting rates for UnitedHealthcare's customers, consistent with UnitedHealthcare's broader business strategies.

14.     UnitedHealthcare has an integrated approach to its underwriting and pricing. Under the leadership of Chief Underwriting Officer Thomas Gehlbach, each of the markets and business segments under UnitedHealthcare's pricing and underwriting umbrella have a unified, integrated, and coordinated pricing and underwriting strategy.

15.     Within UnitedHealthcare's unified underwriting and pricing model, UnitedHealthcare divides the primary responsibility for different markets and "business segments" amongst its leadership team. For example, Albert A Martino III, UnitedHealthcare's Vice President of National Accounts Underwriting, leads the National Accounts business segment, which includes accounts that are primarily 3,000 or more lives, but also many accounts that are under that threshold. Other leaders have primary responsibly for Local Markets, which include public-sector accounts, regional-based accounts, and "Key Accounts," which are accounts that primarily consist of fewer than 3,000 lives. And still other leaders head UnitedHealthcare's other markets. Although certain aspects of these markets and segments differ, they are all still a part of

UnitedHealthcare's unified pricing and underwriting strategy, which, based on business needs, is coordinated across the broad spectrum of its business. The different business segments' leaders regularly collaborate and share confidential and proprietary information to ensure alignment across markets and business segments.

16.     Similarly, certain products exist in multiple markets and are thus closely-related in terms of pricing, trend factors, benefit relativity factors, and network factors. For example, both Local Markets and National Markets include fully-insured products, so the pricing, formulas, and underwriting strategies apply equally to them. And the leaders working in Local Markets and National Markets must ensure that they are aligned on strategy for both fully-insured and self-funded products. For example, team members who work in Local Markets and National Markets collaborate when evaluating network efficiency factors. Network efficiency factors are metrics that UnitedHealthcare uses to evaluate its own networks and compare them to competitors' networks. Although there are some network efficiency factors that vary depending on whether the networks are in the Local Markets versus National Markets, the leaders in those markets compare and share their factors regularly.

17.     Additionally, some of UnitedHealthcare's segments include products that could also be in one of the other segments. For example, National Accounts has responsibility for underwriting the Aon/Hewitt private exchange business, which includes customers both above and below the 3,000-life threshold.

18.     Thus, the Underwriting and Pricing teams in each of the separate UnitedHealthcare markets and segments work closely with one another, share information,

and ultimately develop and implement UnitedHealthcare's integrated underwriting and pricing strategy.

**Louro's Role and Responsibilities at UnitedHealthcare**

19.    Louro began working for UnitedHealthcare in December 2005. Louro's roles involved increasing levels of responsibility within Underwriting and Pricing. For the majority of Louro's tenure at UnitedHealthcare, he worked in National Accounts, which included managing underwriting for customers both above and below the 3,000 life threshold.

20.    Although Louro performed his role in Connecticut, his work for UnitedHealthcare had visibility to proprietary business information at on a nation-wide level, including significant connections to Minnesota. For example, as part of Louro's role, he regularly interacted with UnitedHealthcare employees based in Minnesota. At least one member of Louro's own team worked out of Minnesota and he communicated with her regularly as they both carried out their underwriting responsibilities. Similarly, Louro's role—and all UnitedHealthcare underwriting roles—required regular interaction with UnitedHealthcare's actuarial team, which is based in Minnetonka, Minnesota. Louro interacted with members of the actuarial team who work in Minnesota on a weekly if not daily basis. Similarly, Louro regularly communicated with others on the Specialty Accounts team who were based in Minnesota.

21.    Louro also traveled to Minnesota to perform his job responsibilities, including attending meetings at UnitedHealthcare's headquarters on at least an annual

basis from 2016 through 2019. And UnitedHealthcare's human resources, benefits, and equity in which Louro participated were all coordinated from Minnesota.

22.     Part of Louro's role involved him engaging with UnitedHealthcare's confidential and proprietary information in other business segments. For example, Louro's role required him to underwrite and price out-of-network programs within National Accounts. But the underwriting and pricing for out-of-network programs for National Accounts required regular engagement with other underwriting leaders on the Key Accounts. In one instance, the underwriting and pricing that leaders were implementing in out-of-network programs in Key Accounts in Texas were impacting the out-of-network programs in Texas National Accounts. Louro coordinated with the Key Accounts leader to align their strategies across National Accounts and Key Accounts.

23.     Louro's work as Vice President of Underwriting involved his near-constant exposure to and engagement with UnitedHealthcare's confidential and proprietary information, including details about UnitedHealthcare's rating factors and methods used across UnitedHealthcare's fully-insured block of business. This included work both above and below the 3,000-life threshold, and within and beyond UnitedHealthcare's National Accounts. His role also included daily work with and execution of business strategies, and evaluating, setting, and executing and utilizing pricing factors and methodologies, trend factors, expense levels, margins, and products that relate not only to UnitedHealth's National Account products and services but also to fully-insured products that apply above and below the 3,000 life threshold.

24.     Indeed, Louro participated in detailed and broad-reaching strategy discussions—again, including discussion of highly confidential information—about UnitedHealthcare's long-term strategic planning within Underwriting and Pricing for 2021 and 2022. And he received and participated in discussions about strategy documents that outline UnitedHealthcare's plans for 2021 and 2022.

25.     In February 2019, Louro's role expanded when he received a promotion to Vice President of Underwriting, National Accounts. That promotion increased both his responsibility and scope, and he began leading a team of 16 full time equivalent employees. His added responsibilities included the following:

- all new business pricing for all of UnitedHealthcare's National Accounts, working with the entire new business sales team across the country;

- quoting over 160 Requests for Proposal ("RFPs"), which accounted for approximately 2 million members and $400 million in annual Administrative Services Only ("ASO") revenue, and represented $10 billion in ASO medical spend;

- overseeing the Aon/Hewitt Health Exchange fully-insured business, representing approximately $1 billion in annual revenue and $70 million in profit;

- responsibility for UnitedHealthcare's National Account specialty business, which includes dental, vision, accident, critical illness, and hospital indemnity protection plans, representing almost $300 million in annual revenue.

26.     In addition to those added areas of responsibility, Louro also led several key initiatives regarding ASO pricing strategy and approach, modernizing UnitedHealthcare's risk-based guarantees. He engaged in strategy discussions and implementation with his direct supervisor, Albert Martino. This included discussions about strategies that applied to National Accounts, Local Accounts, and other accounts and business segments.

27.     To execute his responsibilities, UnitedHealthcare gave Louro access to its "ACE" tool (previously known as "ARC") which houses highly confidential and proprietary information. The tool allowed Louro to access information relevant to UnitedHealthcare's pricing processes and business strategies applicable across business segments including, but not limited to, Group Community Rating Factors, Benefit Plan Relativities, Benefit Adjustment Factors, and Prescription Rebate Assumptions. Louro's access to the tool was not simply passive. He regularly engaged with the tool to execute his underwriting responsibilities. Access to ACE is highly controlled and Louro was able to utilize the tool only after his access was preapproved.

28.     Additionally, as part of Louro's responsibility for the Aon/Hewitt exchange, Louro applied UnitedHealthcare's pricing formulas, modeling, and forecasting to accounts that include more than 3,000 lives and to accounts that include fewer than 3,000 lives.

29.     Louro also served on UnitedHealthcare's National Accounts Leadership Council, an elected position. The National Accounts Leadership Council is a high-level strategy group addressing issues across national accounts systems. As part of that council, Louro helped develop National Accounts strategy, which was recommended to more senior level leadership for approval.

**Louro's Contracts**

30.     During the course of his employment with UnitedHealthcare, Louro's work was regularly rewarded with awards of UHG stock options and restricted stock units.

31.     Louro's receipt of stock options and RSUs was conditioned on Louro's acceptance of certain terms and conditions related to those awards that were documented in contracts executed by Louro (the "Option Contracts" and the "RSU Contracts," and together, the "Agreements").

32.     Louro's Option Contracts and RSU Contracts contain restrictive covenants that apply to both UHG and UnitedHealthcare. Indeed, the restrictive covenants sections of the Agreements specifically define "Company" to include UHG and all Affilitates, which includes UnitedHealthcare. When UHG provided Louro with equity and entered into the Agreements with him, Louro and UHG understood that UnitedHealthcare was Louro's employer and UnitedHealthcare was the Affiliate that would provide Louro confidential information in the course of his employment in exchange for Louro's receipt of equity benefits. Louro and UHG agreed that the restrictive covenant provision related to confidential information would protect UnitedHealthcare's confidential information that Louro would receive in exchange for the equity benefits. They also intended that the non-competition section would be evaluated based on Louro's employment with UnitedHealthcare, and the associated activities, products, and services in which Louro engaged and participated, and about which he received confidential information.

33.     The restrictive covenants bar Louro from "disclos[ing] or us[ing] Confidential Information, either during or after the Optionee's employment with the Company, except

as necessary to perform the Optionee's duties or as the Company may consent in writing."

Option Contract § 4(a); *see also* RSU Contract § 8(a).

34. The Agreements also contain "Non-Competition" clauses that provide as follows:

> (c)   <u>Non-Competition.</u>  During Participant's employment and for one year after the later of (i) the termination of Participant's employment for any reason whatsoever or (ii) the last scheduled vesting date under Section 4, Participant may not, without the Company's prior written consent, directly or indirectly, for Participant or any other person or entity, as agent, employee, officer, director, consultant, owner, principal, partner or shareholder, or in any other representative capacity:
>
> > (i)   Engage in or participate in any activity that competes, directly or indirectly, with any Company activity, product or service that Participant engaged in, participated in, or had Confidential Information about during Participant's last 36 months of employment with the Company; or
> >
> > (ii)   Assist anyone in any of the activities listed above.

RSU Contract § 8(c); *see also* Option Contract § 4(c).

35. By signing the Agreements, Louro acknowledged that "[b]ecause the Company's business competes on a nationwide basis, the Participant's obligations under this 'Restricted Covenants' section shall apply on a nationwide basis anywhere in the United States." RSU Contract § 8(d); *see also* Option Contract § 4(d). He also acknowledged that "the provisions of [the] Restrictive Covenants section are reasonable and necessary to protect the legitimate interests of the Company." RSU Contract § 8; *see also* Option Contract § 4.

36. The Agreements also contain forfeiture provisions as follows:

> 3.   <u>Forfeiture of Option and Shares</u>.  This section sets forth circumstances under which the Optionee shall forfeit all or a portion of the Options, or be

required to repay the Company for the value realized in respect of all or a portion of the Options.

(a)     *Violation of Restrictive Covenants*.   If the Optionee violates any provision of the Restrictive Covenants in Section 4 of this Award, then any (i) unvested Options and (ii) Options that vested within one year prior to the Optionee's termination of employment with the Company or any Affiliate or at any time after such termination of employment and that have not been exercised shall be immediately cancelled and rendered null and void without any payment therefor (the "Forfeited Options").   If any such Forfeited Options have been exercised prior to the Optionee's violation of the Restrictive Covenants, the Optionee shall be required to repay or otherwise reimburse the Company, upon demand, an amount in cash or Common Stock having a value equal to the amount described in this Section 3(a) below.

To the extent that such Option Shares have been sold, the amount shall be the aggregate proceeds received from such sale of the net Option Shares acquired after payment of the Exercise Price and any applicable taxes ("Net Option Shares").   To the extent that the Net Option Shares have not been sold at the time Company demand is made, the amount shall be the aggregate Fair Market Value of the Net Option Shares on the date the Forfeited Options were exercised.

(b)     *In General.*  This section does not constitute the Company's exclusive remedy for the Optionee's violation of the Restrictive Covenants or commission of fraudulent conduct.   As the forfeiture and repayment provisions are not adequate remedies at law, the Company may seek any additional legal or equitable remedy, including injunctive relief, for any such violations.   The provisions in this section are essential economic conditions to the Company's grant of Options to the Optionee.   By receiving the grant of Options hereunder, the Optionee agrees that the Company may deduct from any amounts it owes the Optionee from time to time (such as wages or other compensation, deferred compensation credits, vacation pay, any severance or other payments owed following a termination of employment, as well as any other amounts owed to the Optionee by the Company) to the extent of any amounts the Optionee owes the Company under this section. The provisions of this section and any amounts repayable by the Optionee hereunder are intended to be in addition to any rights to repayment the Company may have under Section 304 of the Sarbanes-Oxley Act of 2002 and other applicable law.

Option Contract § 3; *see also* RSU Contract § 7.

37.     The Agreements contain Delaware or Minnesota choice-of-law clauses.  *See* Option Contract § 15; RSU Contract § 11(h).[1]

**Louro's Resignation and Start at Anthem**

38.     On December 3, 2020, Louro resigned from UnitedHealthcare and disclosed his intention to begin employment with Anthem at the end of the month.

39.     Louro's planned role at Anthem is as its as RVP, Underwriting of Anthem's Local Accounts segment up to 3,000 members. On information and belief, in that role, Louro will have the same job responsibilities and tasks that he had at UnitedHealthcare for Anthem's local accounts up to 3,000 members. Anthem has offered to exclude from Louro's responsibility accounts that exceed 3,000 lives; municipalities; specialty; and the Aon/Hewitt exchange.

40.     Even with the exclusion Anthem proposed, Louro's job duties overlap meaningfully with the work that Louro was doing at UnitedHealthcare. The new Anthem role will necessarily involve Louro's performance of services that he engaged in, participated in, and had confidential information about during his last 36 months of employment at UnitedHealthcare. His role will, therefore, violate multiple provisions of the restrictive covenants in the Agreements.

41.     For example, Louro not only received confidential UnitedHealthcare information, but he actively worked with UnitedHealthcare's proprietary pricing formula and strategy which applied to fully-insured clients with greater than 51 eligible lives. He

---

[1] The most recent Agreements contain Delaware choice-of-law provisions; some of the older Agreements contain Minnesota choice-of-law provisions. The restrictive covenant provisions in all versions of the Agreements are identical or virtually identical.

cannot, therefore, perform the same role for accounts under 3,000 lives at Anthem without "disclos[ing] or us[ing] Confidential Information, either during or after [Louro's] employment with [UnitedHealthcare], except as necessary to perform [Louro's] duties or as [UnitedHealthcare] may consent in writing." RSU Contract § 8(a); Option Contract § 4(a).

42.     Moreover, the overlap between Louro's role at UnitedHealthcare and his role at Anthem means that Louro will violate the contractual restrictions on his ability to "[e]ngage or participate in any activity that competes, directly or indirectly, with any [UnitedHealthcare] activity, product or service that [Louro] engaged in, participated in, or had Confidential Information about during [Louro's] last 36 months of employment with [UHG]." RSU Contract § 8(c); Option Contract § 4(c).

43.     Louro will necessarily and inevitably draw on the confidential, proprietary, and trade secret information he had access to while at UnitedHealthcare in performing his new role at Anthem. Louro cannot unlearn UnitedHealthcare's pricing strategies, formulas, and pricing factors, nor can he execute an underwriting role at Anthem without capitalizing on that information from UnitedHealthcare.

44.     For example, Louro will not be able to "forget" what he knows about UnitedHealthcare's pricing and underwriting strategies for 2021 and 2022. Nor will he be able to unlearn UnitedHealthcare's network efficiency factors in the very same accounts Louro intends to price and underwrite at Anthem. Knowing, for example, that UnitedHealthcare is 5% better or 5% worse than Anthem and UnitedHealthcare's other competitors will permit Louro to undercut UnitedHealthcare on the very same business.

Indeed, it would permit Louro to measure Anthem's business against UnitedHealthcare's—using confidential and proprietary efficiency factor information—and thereby develop and deploy a strategy that will benefit Anthem and burden UnitedHealthcare.

45.     In short, Louro cannot avoid capitalizing on his knowledge of UnitedHealthcare's underwriting strategy across multiple segments.

46.     UnitedHealthcare undertakes significant effort to maintain the secrecy of the confidential and proprietary information that Louro has access to precisely because it understands the value that such information has for competitors like Anthem. For example, the confidential information that UnitedHealthcare provided to Louro was available only on a need to know basis. UnitedHealthcare limited circulation of the information and documents to Louro and the other leaders whose roles required their access to and input regarding those plans.

47.     Louro's employment with Anthem will allow Anthem to gain an unfair competitive advantage—and undermine UnitedHealthcare's efforts to retain and expand its market share—through asymmetrical knowledge of UnitedHealthcare's business strategies and tactics.

48.     Anthem's knowledge and/or benefit from the information that Louro knows about UnitedHealthcare's strategies and tactics risks depriving UnitedHealthcare of market share it otherwise would have achieved.

49.     The amount of such impact may not be precisely or accurately quantified or measured given the uncertainty of what UnitedHealthcare would have achieved without Louro's improper disclosure or use of UnitedHealthcare's strategies and tactics.

50.     Additionally, and at a minimum, Louro's assumption of a comparable role for a direct competitor of UnitedHealthcare triggers the forfeiture provisions of Louro's Option and RSU Contracts, to which Louro agreed each and every time he received UHG equity awards. That forfeiture may eliminate Louro's personal gain from his breach of his restrictive covenants, but it would not eliminate the significant damage to Plaintiffs that would result from Louro's breach and his use of confidential and trade secret information.

## FIRST CLAIM FOR RELIEF
### [Breach of Contract]

51.     Plaintiffs repeat and reallege Paragraphs 1 through 49 as though fully set forth herein.

52.     The Agreements are valid and enforceable contracts, and Plaintiffs have fully performed their obligations under the Agreements.

53.     Louro has breached or will breach the restrictive covenants in his Agreements by assuming his assigned role at Anthem, a direct competitor of UnitedHealthcare.

54.     In particular, Louro has or will "[e]ngage or participate in any activity that competes, directly or indirectly, with any [UHG and UnitedHealthcare] activity, product or service that [Louro] engaged in, participated in, or had Confidential Information about during [Louro's] last 36 months of employment with [UHG and UnitedHealthcare]." RSU Contract § 8(c); Option Contract § 4(c).

55.     Louro's employment in the specific role he has assumed at Anthem will also result in the use or disclosure of UnitedHealthcare's Confidential Information, because Louro cannot divorce himself from the confidential and proprietary information he

possesses about UnitedHealthcare's short- and long-term underwriting strategies and tactics while working for Anthem.

56.     As a result, Louro also has breached or will breach the non-disclosure provisions of his contractual agreements.

57.     Louro's breaches of the restrictive covenants in his Option Contracts and RSU Contracts will cause additional, irreparable harm to Plaintiffs.

58.     Louro's breach and/or anticipatory breach of the restrictive covenants in the Agreements has resulted or will result in the forfeiture and/or necessitates the repayment of certain stock option and RSU benefits conferred on him by those Agreements, and will result in damages to Plaintiffs.

59.     Plaintiffs seek both injunctive relief and monetary damages.

## SECOND CLAIM FOR RELIEF
### [Defend Trade Secrets Act (18 U.S.C. § 1836)]

60.     Plaintiffs repeat and reallege Paragraphs 1 through 58 as though fully set forth herein.

61.     Plaintiffs have trade secrets related to their businesses and products with which Louro was involved, including short- and long-term strategic underwriting plans and tactics.

62.     Plaintiffs derive economic value from these trade secrets because they are not known to Plaintiffs' competitors. These trade secrets thus allow Plaintiffs to gain a competitive advantage in the market through the strategies, tactics, and information it invests in developing.

63.    Plaintiffs maintain the confidentiality of these trade secrets both internally and externally. Access to Plaintiffs' trade secrets is limited to a small number of individuals who directly contribute to the development, analysis, or implementation of the information and whose roles require their access to the information.

64.    Access to Plaintiffs' trade secrets is not available to Plaintiffs' employees who do not need to know the information as part of their day-to-day work.

65.    Individuals who are given access to Plaintiffs' trade secret materials are subject to agreements containing non-disclosure obligations and other restrictive covenants.

66.    In his planned employment with Anthem, Louro will inevitably misappropriate Plaintiffs' trade secrets, because he will be unable to perform his assigned role at Anthem without considering and drawing upon Plaintiffs' confidential and proprietary information.

67.    Louro's misappropriation of Plaintiffs' trade secrets will cause irreparable harm and will allow Anthem to undermine Plaintiffs' competitive advantage in the markets in which the companies directly compete. Plaintiffs have gained their competitive advantage by investing in, and rigorously protecting, the trade secret information that Louro now threatens to misappropriate.

68.    Plaintiffs seek injunctive relief to prevent Louro's actual and threatened misappropriation of their trade secrets, as well as damages to compensate them for misappropriation that may have already occurred.

## THIRD CLAIM FOR RELIEF
### [Minnesota Trade Secrets Act (Minn. Stat. § 325C.01 *et seq.*)]

69.     Plaintiffs repeat and reallege Paragraphs 1 through 67 as though fully set forth herein.

70.     Plaintiffs have trade secrets related to their businesses and products with which Louro was involved, including short- and long-term strategic underwriting plans and tactics.

71.     Plaintiffs derive economic value from these trade secrets because they are not known to Plaintiffs' competitors. These trade secrets thus allow Plaintiffs to gain a competitive advantage in the market through the strategies, tactics, and information they invests in developing.

72.     Plaintiffs maintain the confidentiality of these trade secrets both internally and externally.  Access to Plaintiffs' trade secrets is limited to a small number of individuals who directly contribute to the development, analysis, or implementation of the information and whose roles require their access to the information.

73.     Access to Plaintiffs' trade secrets is not available to Plaintiffs' employees who do not need to know the information as part of their day-to-day work.

74.     Individuals who are given access to Plaintiffs' trade secret materials are subject to agreements containing non-disclosure obligations and other restrictive covenants.

75.     In his employment with Anthem, Louro will inevitably misappropriate Plaintiffs' trade secrets, because he will be unable to perform his assigned role at Anthem without considering and drawing upon Plaintiffs' confidential and proprietary information.

76.     Louro's misappropriation of Plaintiffs' trade secrets will cause irreparable harm and will allow Anthem to undermine Plaintiffs' competitive advantage in the markets in which the two companies directly compete. Plaintiffs have gained its competitive advantage by investing in, and rigorously protecting, the trade secret information that Louro now threatens to misappropriate.

77.     Plaintiffs seek injunctive relief to prevent Louro's actual and threatened misappropriation of Plaintiffs' trade secrets, as well as damages to compensate them for misappropriation that has already occurred.

### FOURTH CLAIM FOR RELIEF
### [Delaware Uniform Trade Secrets Act (6 De. Code § 2000 *et seq.*)]

78.     Plaintiffs repeats and realleges Paragraphs 1 through 76 as though fully set forth herein.

79.     Plaintiffs have trade secrets related to their businesses and products with which Louro was involved, including short- and long-term strategic underwriting plans and tactics.

80.     Plaintiffs derive economic value from these trade secrets because they are not known to Plaintiffs' competitors.  These trade secrets thus allow Plaintiffs to gain a competitive advantage in the market through the strategies, tactics, and information it invests in developing.

81.     Plaintiffs maintain the confidentiality of these trade secrets both internally and externally.  Access to Plaintiffs' trade secrets is limited to a small number of individuals who directly contribute to the development, analysis, or implementation of the information and whose roles require their access to the information.

82.     Access to Plaintiffs' trade secrets is not available to Plaintiffs' employees who do not need to know the information as part of their day-to-day work.

83.     Individuals who are given access to Plaintiffs' trade secret materials are subject to agreements containing non-disclosure obligations and other restrictive covenants.

84.     In his employment with Anthem, Louro will inevitably misappropriate Plaintiffs' trade secrets, because he will be unable to perform his assigned role at Anthem without considering and drawing upon Plaintiffs' confidential and proprietary information.

85.     Louro's misappropriation of Plaintiffs' trade secrets will cause irreparable harm and will allow Anthem to undermine Plaintiffs' competitive advantage in the markets in which the companies directly compete. Plaintiffs have gained their competitive advantage by investing in, and rigorously protecting, the trade secret information that Louro now threatens to misappropriate.

86.     Plaintiffs seek injunctive relief to prevent Louro's actual and threatened misappropriation of trade secrets, as well as damages to compensate them for misappropriation that has already occurred.

**WHEREFORE**, Plaintiffs hereby respectfully request judgment against Defendant for all of the following:

a.     Damages for Louro's breaches or anticipatory breaches of contract and misappropriation of Plaintiffs' trade secrets in an amount to be determined at the trial;

b.     Issuance of injunctive relief prohibiting Louro from employment in his assumed role at Anthem or any other role that breaches the restrictive covenants in his contracts for a period of 12 months from the date the Order is entered;

c.   Issuance of injunctive relief prohibiting Louro from using or disclosing Plaintiffs' trade secrets or confidential information;

d.   An award to Plaintiffs of their costs, attorneys' fees, and expenses;

e.   An award of pre- and post-judgment interest on Plaintiffs' damages; and

f.   Any such other and further relief as the Court deems just and equitable.

Dated:  December 30, 2020                **GREENE ESPEL PLLP**


 */s/ Jenny Gassman-Pines*
Jenny Gassman-Pines, Reg. No. 0386511
Anna M. Tobin, Reg. No. 0395706
222 S. Ninth Street, Suite 2200
Minneapolis, MN  55402
jgassman-pines@greeneespel.com
atobin@greeneespel.com
(612) 373-0830

Attorneys for Plaintiff